429 So.2d 564 (1983)
SAMMONS COMMUNICATIONS, INC.
v.
Don E. POLK.
No. 53578.
Supreme Court of Mississippi.
February 16, 1983.
Rehearing Denied April 13, 1983.
Handy, Fitzpatrick, Gwin, Blough & Lewis, Lucien C. Gwin, Jr., Natchez, for appellant.
Alfred Lee Felder, McComb, for appellee.
Before PATTERSON, C.J., and ROY NOBLE LEE and PRATHER, JJ.
ROY NOBLE LEE, Justice, for the Court:
Don E. Polk filed suit against Sammons Communications, Inc. [Sammons] in the Circuit Court of Pike County, Honorable Joe N. Pigott, presiding, for nonpayment of services under a contract. Sammons filed an answer and counterclaim alleging that Polk had not fully completed the work and that portions of the work were improperly done. The jury returned a verdict for Polk in the sum of $17,500.00, and for Sammons on the counterclaim in the amount of $7,000.00, leaving a net award to Polk in the sum of $10,500.00. Sammons has appealed, and assigns six errors in the trial below.
The suit involves a contract executed between Sammons and Polk wherein Polk agreed to lay and install television cable (Sammons is a cable television company) according to certain specifications for a stipulated price schedule. The cable consisted of copper wire surrounded by a plastic spacer which was enclosed in an aluminum shell. The spacer was necessary in order to prevent the copper wire, which carries the signal, from touching the aluminum shell. If they came in contact with each other, the signal was degraded or scrambled. Accordingly, the cable was required to be bent with care in order to avoid crimping or kinking. The outside of the cable was covered with a plastic jacket for insulation.
*565 Installation of the cable was accomplished by stringing it along existing power and telephone lines. Permits were required from those companies before the work could begin on the poles. The first step required running a steel cable called a "strand" from pole to pole securing it by appropriate clamps and guide wires. When it was installed, the strand supported the television cable, which subsequently was tied to it. That second step is referred to as "lashing." This was done by running a lasher machine along the strand while one or two cables were simultaneously fed into it from spools or reels of cable on the ground. As the lasher was pulled along, it wrapped lashing wire around the television cable, securing it to the strand, resulting in a tightly-wrapped cable.
Proper installation required that the cable have adequate spacing in regard to the power and telephone lines and that "sag" in the cable be uniform with the existing lines. It was necessary to put the cable on the same side of the poles as the other lines in order to prevent entanglement in the event the pole had to be replaced. The last step involved bending of the cable into an "expansion loop" at each pole. This bending accounts for the expansion and contraction of the line in hot and cold weather, and each expansion loop had to be uniform in length and spacing.
According to Polk, he had done this type of work since 1969, and, in the summer of 1979, he lived and worked in McComb. The contract was executed between Polk and Sammons June 18, 1979. Sammons was to furnish the necessary materials and permits, and Polk was to supply the labor. On the trial, Polk identified two purchase orders, one for approximately 12.2 miles in McComb, and another for approximately ten miles in Brookhaven. Those orders specified the amount of work and the contract controlled the method of construction. He also identified invoices covering the period from July 6 to October 13, 1979, which had been paid by Sammons, and three other invoices dated October 18, October 26, and November 2, 1979, in the sum of $5,383.66, which had not been paid. Polk testified that he had properly submitted the invoices; that he had been assured that they would be paid; that, by November 1, Sammons no longer provided him work and did not have pole permits necessary for work. He was finally told there would be no permits until the new year, and, for that reason, Polk said he laid off his four-man crew about November 10. According to the contract provisions, Sammons' inspection of the work was to be done within ten days, and notice of rejection was required within fifteen days of the inspection. Polk said he never received any written notice, and that he is still unpaid from the invoices.
According to Polk, he was asked to replace five hundred (500) feet of cable in Brookhaven, which he agreed to do, and he was approximately 102,000 feet of cable incomplete when the work ended, which would have required approximately thirty working days. He claimed that his crew could lay 5,000 feet of cable per day (2,500 feet of strand and 2,500 feet of cable); that Sammons would owe about $525.00 per day for that work; that his net profit would have been $12,229.12, which does not include $5,383.66 remaining to be paid on the other invoices.
Polk admitted on cross-examination that he had billed Sammons for 98,474 feet of completed work; that, if there was 102,000 incomplete, the total amount would be about 38.65 miles while his contract only called for approximately twenty-two miles; and that he had not made actual measurement of the uncompleted footage, since he didn't know exactly where to begin or end. He admitted that members of his crew had no experience with television cable, although they did have some power line or general construction experience; that the contract required him to have experienced personnel; that they could finish within thirty working days, although it took approximately four months for him to string 98,000 feet; that the delay was caused by Sammons' failure to supply permits and material; that he supervised all of the work and that it was done properly. He agreed that air loops (places where the cable is not *566 tightly lashed) are improper and that the expansion loops and guides were improperly done. Polk denied that 22,000 feet of cable on Meadowbrook Drive were defective, and that 1,500 feet on Sagewood Drive was defective. He admitted that, occasionally, the plastic coating on the cable was pulled off, but he told Sammons about same and was not asked to replace any of the cable, and that he had never bent or mashed the cable.
In short, Polk's testimony was to the effect that he properly installed the cable, according to the contract, that his failure to complete the contract was on account of Sammons' refusal to supply him with materials and permits and that the breach of the contract was caused by Sammons.
Lamar Rushing, 10-year employee of Sammons, holds the position of head technician. He was familiar with the contract and, according to him, Sammons had loaned Polk most of the necessary equipment for the work. Sammons also bought a special tool for forming expansion loops and gave it to Polk. Such tool would create a uniform loop without crimps. Rushing inspected Polk's work and found the cable was laid improperly; it often was placed on the wrong side of the poles; the air loops and sags on the cables were not set correctly; and the cable was pulled and jerked through areas overgrown with brush and along rough terrain which resulted in 2,300 feet of unusuable cable; and there were similar instances of poor workmanship.
Photographs of air loops, crimped, broken or bent cable, improper sag, loose or no lashing, and improper expansion loops were admitted in evidence. Rushing testified that Sammons had hired another contractor to rework approximately ninety-five percent of the work Polk had done. Such work was expensive, and 40,000 feet of cable could not be salvaged. A bill for the clean-up work, which was improper work done by Polk, amounted to $48,708.75. Sammons claimed that it would have received $15,697.40 from the sale of cable work during the four months required to rework and clean up the cable, that the total figure for lost revenue, loss of unsalvageable cable, lashing wire, and labor costs for reworking is $69,697.00.
Doug Smith testified for Sammons that he has been in the cable construction business for sixteen years and has done work in several cities all over the country. His firm was hired by Sammons to rework and clean up the job done by Polk, and he worked in McComb from May 12 to September 11, 1979. Smith described Polk's work as "a mess." He found broken lashing, air loops, improper bolts, and no guide wires, which was not standard practice. Expansion loops were not uniform, and the system was not properly grounded. Smith's firm replaced 40,000 feet of cable and a mile of strand and was paid $47,708.75 for the work. When he had finished the clean-up job, the system was ready to be energized.

I.
Is the jury's verdict on Sammons' counterclaim so grossly inadequate that it evinces bias and prejudice on the part of the jury?
Sammons contends that the award of $7,000.00 on his counterclaim is grossly inadequate, and that a new trial should be granted on the issue of damages. The evidence is undisputed that Sammons had to employ the Smith firm to clean up and repair the work and installation performed by Polk which amounted to the following:

 Labor for corrective installation $48,708.75
 Replacement cable 4,500.00
 Replacement lashing wire 1,000.00
 __________
 TOTAL $54,208.75

The evidence from the Smith firm, which did the clean-up work, bears a great deal of weight, and, in our opinion, the verdict on the counterclaim is against the overwhelming weight of the evidence. See Toyota Motor Co., Ltd. v. Sanford, 375 So.2d 1036 (Miss. 1979); and Dickey v. Parham, 295 So.2d 284 (Miss. 1974).

II.
Was the jury's verdict as to Sammons' liability against the overwhelming weight of the evidence?
*567 This assignment of error can well be discussed along with the first assignment. Polk argues that he properly did the work and that there is conflicting evidence for the jury to decide. However, photographs and testimony set forth the condition of the cable and instances where the work was improperly done. Further, it is not reasonable or logical that Sammons would employ the Smith firm at $54,208.75 to redo work that was properly done. We hold that the jury verdict was against the overwhelming weight of the evidence.

III.
Did the circuit court err in refusing evidence showing an oral modification of the written contract and in refusing Jury Instructions D-21, D-22 and D-23?
Sammons' manager, Mr. Hines, attempted to explain why Polk had not been given written notice of the problems that needed to be corrected and referred to their "working arrangement." The court sustained an objection and would not admit the testimony apparently based on the parol evidence rule.
In Renfroe v. Aswell, 198 Miss. 159, 21 So.2d 812 (1945), involving a dispute over the ownership of a sawmill, the Court held that one of the partners could introduce evidence of an oral agreement rescinding a written contract for the sale of his half of the business. The Court said:
Evidence is generally admissible to show a subsequent parol agreement, valid under the law and effective as to its subject matter, between the parties to a written instrument, although it may alter or abrogate such writing, and especially so where such parol agreement is acted upon by the parties. Lusk-Harbison-Jones, Inc., v. Universal Credit Co., 164 Miss. 693, 145 So. 623, 624; 32 C.J.S., Evidence, p. 1008, Sec. 104. [198 Miss. at 162, 21 So.2d at 813].
See also Williamson v. Metzger, 379 So.2d 1227 (Miss. 1980) and Commercial Credit Corp. v. Long, 225 Miss. 164, 82 So.2d 847 (1955).
We are of the opinion that it was proper for Sammons to show there had been a modification of the contract, if he properly qualified such modification. On retrial, if the modification is allowed, then proper instructions should follow from such modification.

IV.-VI.
Did the trial court err in failing to return the jury for further deliberations when the form of the verdict they returned was irregular?
Did the circuit court err in failing to strike surplus language in the form of the verdict?
Did the circuit court err in denying appellant's motion for a new trial on the issue of damages?
In view of the conclusions drawn on the foregoing assignments of error, it is not necessary to discuss Nos. VI, V and VI, since they probably will not recur on a new trial.
The judgment of the lower court is reversed, and the case is remanded for trial on all issues.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.